UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DANIEL LEE WOLFE,

                Petitioner,              Case Number 01-10053-BC
                                           Honorable David M. Lawson

v.

BARBARA BOCK,

                Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

       The petitioner, Daniel Lee Wolfe, presently confined at the Lakeland Correctional Facility in Coldwater, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, filed with the assistance of counsel from the Michigan State Appellate Defender's Office, the petitioner challenges his conviction and sentence of one count of first-degree felony murder, Mich. Comp. Laws § 750.316(b), and one count of possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b ("felony firearm"). He was sentenced to life in prison without parole for the murder conviction and two years in prison for the felony firearm conviction, to be served consecutively. The petitioner asserts that he is in custody in violation of his constitutional rights because the prosecution failed to disclose potentially exculpatory evidence, his trial counsel was ineffective, there was a fifteen-year delay between the crime and the trial, the evidence was insufficient to support the verdict, the prosecutor made improper statements, and a biased juror tainted the jury pool during voir dire. The respondent asserts that the claims are procedurally defaulted or without merit. Although the Court finds, with one exception, that the petitioner's claims are not barred by the doctrine of procedural default, the Court concludes that the petitioner's claims are without merit. Therefore, the petition will be denied.

I.

The petitioner's convictions result from the killing of Donald Reynolds, who was murdered in the early morning hours of September 4, 1980 during a robbery outside of the bar that he owned in Jackson, Michigan. No one was arrested immediately after the crime, but the investigation was reactivated after authorities received information from a confidential informant fourteen years later. The petitioner and co-defendant Gregory Derbyshire eventually were charged with first-degree felony murder, first-degree premeditated murder, armed robbery, and possession of a firearm during the commission of a felony. They were tried jointly but with separate juries. The Derbyshire jury returned its verdict first; both defendants ultimately were found guilty of first-degree felony murder, felony firearm, and armed robbery. The armed robbery convictions were vacated later.

A.

The trial was held in the Jackson County, Michigan Circuit Court in January 1996. The prosecution's main witness was Gary Raab, a former friend of the petitioner and Derbyshire who claimed to be with them when they committed the crime. During his initial police interview in December 1994, Raab told the police that he knew nothing about the crime. At his second police interview six months later, which was tape recorded in the presence of his attorney, Raab vaguely described driving around in a car with the defendants on the night of the crime. The recording of this interview was disclosed to the petitioner's attorney only after trial. Raab gave a third statement on September 8, 1995, which matched his trial testimony more closely. Defense counsel was given this statement before trial.

At the January 1996 trial, Raab gave a detailed and disjointed account of the events surrounding the robbery. Raab testified that on the evening of September 3, 1980, he and Joe Griehs

met up with the petitioner and Derbyshire at the Westwood Mall in Jackson.  Raab and Griehs

agreed to ride around and smoke marijuana with the petitioner and Derbyshire.  As Raab and Griehs

rode in the backseat of the car and Derbyshire drove, the petitioner informed the men that he knew

of a place where they could steal a lot of money and offered to split the proceeds with Raab and

Griehs if they assisted.  The four men eventually stopped at the Silver Rail Bar, which was owned

by Reynolds.  When they arrived at the bar, Griehs and Raab refused to assist the petitioner and

Derbyshire in stealing the money.  Derbyshire parked the car at the end of the bar's parking lot, got

out of the car, went to the trunk, and then came back.  After telling Raab and Griehs that they were

going to "jump off the building and steal the guy's money," the petitioner and Derbyshire began

walking towards the bar.  Tr. at 856.

Raab testified that he waited twenty minutes for the petitioner and Derbyshire to return.

Then he got into the front seat of the car and drove it to the Jackson Recreational Trailer Park across

the street from the bar to determine if Derbyshire or the petitioner were on the roof.  When Raab was

unable to observe any activity, he returned to the bar's parking lot.  The petitioner and Derbyshire

returned ten to fifteen minutes later, saying that they had not done anything.  Derbyshire then drove

the car through the trailer park until a person approached the car.  As Raab and Griehs attempted to

hide themselves in the backseat, the person who approached the vehicle asked the men what they

were doing and whether they were looking for someone, to which one of the occupants replied that

they were looking for "Terry."  Tr. at 863.  Then the group left the trailer park and dropped Joe

Griehs at his house.  Raab explained that he would have gotten out of the car at Griehs's house and

walked home, but he was "too high" to walk.  Tr. at 864.  Instead of taking Raab home, Derbyshire

suggested that the men return to the bar and get the money.  When Raab repeatedly asked to be taken home, Derbyshire told him to shut up.

Raab testified that the three men returned to the Silver Rail Bar.  Derbyshire and the petitioner said that they were going to steal the money, got out, and headed for the back of the car. Raab laid back in the back seat and heard a noise.  He sat up, looked out the window, heard a gunshot, and saw a flash of light.  Through that flash of light, Raab claimed that he could see the petitioner, Derbyshire, and an older man all bunched up together and face to face with one another. Raab got down in his seat again and the petitioner and Derbyshire returned to the car.  Derbyshire was hiding a box under his shirt and the petitioner kept saying, "Why, Greg, Why?"  Trial Tr. at 871. When Raab asked what the "bang" noise was, the petitioner and Derbyshire both told Raab that he had heard nothing.

Derbyshire drove to an open field where he and the petitioner got out.  Derbyshire tossed Raab a bag of marijuana and told him to stay in the car.  Then Derbyshire and the petitioner went to the trunk of the car and then into the field.  Raab eventually got out of the car and saw that the petitioner and Derbyshire had taken off some of their clothing.  Derbyshire had a handgun and was waving it around.  Raab did not observe any rifles.

Derbyshire drove the three men over to an apartment on 17th Street where the petitioner lived with Donna Kilgore, his girlfriend.  The petitioner and Derbyshire got out of the car and knocked on the apartment door; an unidentified person let them in.  A few minutes later, Raab entered the apartment and saw Derbyshire and the petitioner arguing, and Donna Kilgore yelling and asking what was going on.  The petitioner asked Derbyshire if he had shot or hurt someone.  Raab

-4-

asked both men if they had hurt anybody.  Then Raab returned to the car.  The petitioner and Derbyshire came out later to drive Raab home.

When Raab returned to the petitioner's apartment the next morning, he noticed that all the blinds and curtains were shut.  When Raab tried to open the curtains, Derbyshire and the petitioner came running from the kitchen and told him to close them.  Raab also noticed a box containing personal checks on a shelf and some change laying on a couch cushion partially covered by a blanket.  After Derbyshire and the petitioner left the apartment, Raab helped Donna Kilgore clean the apartment and burn some garbage, including the box with the checks.

Raab admitted that he was testifying against the petitioner and Derbyshire in exchange for immunity from prosecution.  On cross-examination, Raab admitted telling Detective Clifton Edwards during his first interview that he could not recall anything concerning the incident.  Raab said that he only recovered his memory of the events after having spoken with Detective Edwards in December of 1994, through "flashes" that he had in his sleep.  Raab also told Detective Edwards that he had a grudge against the petitioner.

Joe Griehs testified that he had no memory of sitting in the back of the car with Gary Raab on the night of the homicide.  However, Griehs testified that one week before the homicide, he rode in the petitioner's car with the petitioner, Derbyshire, and another person.  On that occasion, the petitioner parked his car in the trailer park, and the petitioner and Derbyshire got out of the car and walked towards the Silver Rail Bar.  Griehs saw a fairly large man walk out of the bar carrying a box along with something long, like a rifle.  The man locked the door of the bar, then walked to a Suburban, unlocked it, got in and drove away.  Five or ten minutes later, when the petitioner and Derbyshire returned to the car, Derbyshire said, "We're going to have to get up on the roof and jump

off." Tr. at 727. On cross-examination, Griehs admitted that he never heard the petitioner plan a robbery of the Silver Rail Bar. Griehs also testified that the petitioner had recovered $35,000 in a personal injury settlement from a car accident in which Gary Raab was the driver. Griehs admitted that he started dating Donna Kilgore after she and the petitioner broke up; as of the time of the trial, they had been together for thirteen years.

Michael Frick, a former resident of the Jackson Recreational Trailer Park, testified that in the early morning hours of September 4, 1980, a light colored car that appeared to have one occupant pulled up as Frick was returning home. The driver of the vehicle stared at him and asked him where a woman named Terry lived. Frick recognized the driver as matching a composite sketch of a person published in the newspaper following the murder. In 1994, Frick identified Wade Miller, another prosecution witness and friend of the defendants', as being the driver of that car. Although he was not positive, Frick said that he did not see anyone else in the car that night.

Donna Kilgore testified that she awoke in the early morning hours of September 4, 1980 to the sounds of the petitioner arguing with Derbyshire. One of the two (she was not sure which) was saying, "Why did you pull the trigger? Why did you have to shoot him?" Tr. at 770. Kilgore went into the kitchen to make a bottle for her baby when she observed Gary Raab sitting on the couch; the petitioner and Derbyshire were arguing. The petitioner was not wearing a shirt, but otherwise they were all clothed. Kilgore testified that she had moved into the apartment in July of 1980 and lived there for four to six weeks until mid-August, when she moved out. However, Kilgore testified that she stayed there on and off afterwards. Kilgore acknowledged that she did not tell Detective Boyer of this argument when Boyer first contacted her nine years prior to trial. Kilgore further acknowledged that she had lied both to Detective Boyer and to Detective Edwards the first time that

she spoke to them.  She contradicted Raab's testimony, stating that he did not help her clean the apartment or take out the garbage; she also said that she never burned any garbage when she lived at that apartment.  She testified that she did not notice any box of checks or large amounts of change in the apartment that day.

Ronald McClumpha, the petitioner's landlord, verified that the petitioner and Donna Kilgore had lived at that residence.  However, McClumpha could not state with certainty when the petitioner lived at the residence.  McClumpha testified that the succeeding tenants signed a lease dated September 27, 1980, but McClumpha received only two months rent from the petitioner and Kilgore and there was no indication when the two vacated the apartment.

Tom Walling, another friend of the petitioner and Derbyshire at the time of the murder, testified at the preliminary examination that Kilgore told a group consisting of himself, Wade Miller, Charles Melton, and Joe Griehs, "I don't care if they did it or not, we have to burn" the petitioner and Derbyshire.  Tr. at 1090-91.  Kilgore apparently was angry with the petitioner because he did not share with her and their child the money that he had received from a civil lawsuit and an inheritance.  Kilgore admitted that the petitioner's refusal to share the money with her and their child angered her, but she stated that she could not remember making the statement that "we have to burn them."  Tr. at 795-97.  However, Charles Melton corroborated Tom Walling's testimony.

Robert Kothe, a truck driver, testified that he passed the Silver Rail Bar between 3:23 and 3:37 a.m. on September 4, 1980.  He observed what he thought was an altercation with two white males standing in the parking lot and a person lying on the ground.  One of the men had his hands up as if he had just hit the one on the ground and the other was holding what appeared to be a stick. Kothe noticed a pickup truck parked thirty feet from the bar and a blue or green car with a white or

light stripe parked further back in the parking lot.  This testimony contradicted Raab's description that the men had been driving in a red car.

The victim suffered two gunshot wounds to the head.  There was no evidence of close-range firing or powder burns on the victim's body.  Sergeant Boyer testified that there would have been powder burns on the victim's body if a gun was fired at a distance of less than two feet.

David Townshend, a police crime laboratory specialist, testified that the bullet taken from the victim's body came from a .22 caliber Marlin semiautomatic rifle, and not from a Winchester like the rifle the victim was known to carry.  Townshend acknowledged that there would have been a brief flash of light when such a weapon was discharged, but that it would produce less flash than a revolver.  The reflected light  would be dimmer the farther away it was from the observer, and any light that might travel back to illuminate the shooter would be very dim.

Delbert Zimmerman, the police evidence technician, discovered a red lighter, money, a set of keys, a cigar butt, a button, and a package of cigarettes near where the victim lay.  One bullet was recovered from the driver's side door of the victim's car and a lead fragment from the hubcap. Zimmerman admitted that the victim's vehicle was forty to fifty feet away from the bar, and that "[y]ou'd be a world champion" if you could jump from the roof onto someone standing close to the car. Tr. at 344, 346.  Zimmerman also testified that based upon the location of the bullets found by the car, the shots had to come from the direction of the parking lot, rather than from the direction of the bar.

Several of the victim's family members testified that the victim always took a tackle box with money and a .22 Winchester rifle for self-protection when he locked up the bar at night. Neither of these items was ever recovered.  The victim would cash the paychecks of the employees

of the Michigan Seat Company on Fridays; he would only go to the bank to get the money to cash these checks on Fridays.  September 3, 1980 fell on a Wednesday, before the victim would have obtained this money.  The petitioner worked for the Michigan Seat Company for a short time in 1979 and had been to the Silver Rail Bar during that time.

Michael Hession testified that he shared a jail cell with the petitioner at the Jackson County Jail in late 1983 or early 1984.  Hession testified that the petitioner admitted that he had robbed someone at the Silver Rail Bar and taken the cash box, and that there was a struggle and "[t]he gun went off."  Tr. at 1018.  The petitioner told Hession that one person waited on one side of the building, the other person waited on the other side of the building, and they surprised the victim. Hession testified that the petitioner said that he "got a gun from there" and "it would never be found" because "he threw it in the river."  Tr. at 1020.  Hession admitted on cross-examination that he had read about the robbery in the newspaper and had gone to the police with this information in an attempt to obtain a reduced sentence.  Hession also stated that he did not receive any benefit from coming forward.  At the preliminary examination, Hession initially had testified that he did not recall what the petitioner told him.  Defense witnesses Ricky Parris and Mark Wolfe shared the jail cell with Hession and the petitioner and both denied hearing this conversation between the two men.

Detective Boyer testified that as early as October of 1981, he had questioned the petitioner as a suspect in the Silver Rail Bar murder.  During that interview, the petitioner told Boyer that twice he had sat in a car parked across the street from the bar to watch the victim lock up the bar, once with Tom Walling and once with Greg Derbyshire, in May or June before the killing occurred.  The petitioner told Boyer that Tom Walling wanted to jump down from the roof of the bar onto the victim or hide in the victim's car and strike him on the head when he entered the car.  However, the

-9-

petitioner wanted nothing to do with the robbery because the victim carried a rifle.  During a second

interview in November of 1981, the petitioner admitted to Boyer that he had attempted a robbery

of the bar with Greg Derbyshire, but the men left when the victim pulled a rifle on them.  Boyer

testified:

> [H]e had drove his Nova to the location of the bar, and he had parked it down the
> road from the bar, alongside the road.  They had got out of the Nova and were
> walking back to the bar, and they were approximately in front of the Silver Rail Bar
> when Mr. Reynolds had come out.  Mr. Reynolds pulled the rifle on them and
> pointed it at them, and he told them to get out of there.
>
> At that point, Danny indicated that he told Mr. Reynolds that he was trying to find
> a telephone to use.  And as a result of this, the confrontation with Reynolds, they
> departed the bar.

Tr. at 1053.  The petitioner said that these events occurred six months to a year before the killing.

On cross-examination, Detective Boyer admitted that because Tom Walling had been incarcerated

in 1980, the petitioner could have watched the bar with Walling only in May or June of 1979, over

a year before the killing occurred.  Detective Boyer also admitted that Wade Miller previously had

told him that Miller, Walling, and Derbyshire had sat in a car at the trailer park watching the bar,

but without the petitioner.  Tom Walling denied ever sitting in a car watching the bar with

Derbyshire.

Wade Miller testified that he had heard conversations between the petitioner and Derbyshire

in which the two men planned robbing the victim by having one of them jump off of the roof.  On

cross-examination, Miller admitted that he had lied to Detective Edwards several times during a

recorded interview.  Miller said that he became nervous when he was told that he was identified in

a photographic lineup as the driver in the robbery and murder.  Miller admitted that he had lied to

Detective Edwards when he first talked to him and told Edwards that the petitioner had no

-10-

involvement with the crime and that any information Miller had was "hearsay." Trial Tr. at 680, 685. During the recorded interview, Detective Edwards had stated, "But it would be helpful to our investigation if you, in fact, sat across the road with one of them or both of them at the time and talked about this – that that was true, if you could share it with me." Tr. at 681. Miller testified that in August of 1980, he, Tom Walling, the petitioner, and Derbyshire had sat across from the Silver Rail Bar discussing the robbery. However, Walling and a prison records supervisor said that Walling was incarcerated at the State Prison for Southern Michigan from December 1979 through June 1982.

Defense witness Carol France, the manager of the Jackson Recreational Trailer Park, testified that in the early morning of September 4, 1980, she awoke at about 2:30 a.m. when her dog started barking. She heard what sounded like a single backfire from the direction of the highway. She did not hear anything else when she went outside to see if someone was in her yard. Once she was inside, she heard a loud truck, looked out her living room window, and saw one of her tenants, Christopher Fry, drive by in a pick up truck. France observed Fry drop something metal in the dumpster that made a noise as it hit the side.

A second defense witness, Eugene Hobbins, who lived behind the Silver Rail Bar past the railroad tracks, testified that at around 3 a.m. on a day in early September, he saw his neighbor, John Wheeler, run quickly and dive into the basement window of Wheeler's house. Hobbins testified that Wheeler attempted to sell him two .22 caliber rifles at around the same time, telling Hobbins that they were not his guns, but they belonged to somebody he knew. John Wheeler testified at trial and admitted committing several burglaries, including one against the Silver Rail Bar in 1981 or 1982, but denied that he ran home on September 4, 1980. Wheeler could not recall selling two .22 caliber

-11-

rifles to Hobbins.  Wheeler admitted that he would go to the Silver Rail Bar with his friends around that time, and he walked there across the railroad tracks.  A live .22 round was found on the railroad tracks after the murder.

On January 10, 1996, a jury convicted the petitioner of first-degree felony murder and possessing a firearm during the commission of a felony.  He was sentenced to life in prison without parole for murder and a consecutive two-year term for felony firearm.

### B.

The petitioner filed a claim of appeal on February 20, 1996.  His co-defendant, Gregory Derbyshire, who was also convicted of murder, had moved for a new trial on the grounds of ineffective assistance of counsel.  On January 28, 1997, the petitioner filed a motion to join the co-defendant's motion for a new trial.  It is not clear from the record whether the petitioner's case had been remanded by the court of appeals at that time.  Nonetheless, on February 28, 1997, the trial court granted the petitioner's motion to join in the co-defendant's post-trial hearing to determine whether his trial counsel had been ineffective.  The petitioner's trial counsel testified at the post-trial hearing as to why he declined to investigate the possible alibi defense of the co-defendant, failed to contact the manager of the petitioner's old apartment complex, whether he failed to move the court to have the petitioner's jury polled on whether they heard the disturbance outside the courtroom when the co-defendant's verdict was announced or any news coverage of the co-defendant's verdict before they reached their own verdict, whether he moved to have the petitioner's legs unshackled, whether he attempted to learn the identity of a confidential informant, and what evidence he presented that someone else could have committed the crime.

-12-

The trial court denied the petitioner's motion for a new trial in July of 1997 following the hearing.  In October of 1997, the Michigan Court of Appeals granted the petitioner's motion to remand the case to the trial court for another hearing on a motion for a new trial concerning newly discovered evidence:  the tape of Raab's second interview with the police and the previously-unknown fact that Raab was under a prison commitment at the time of the murder.  The petitioner alleged that this evidence was exculpatory and improperly withheld from him by the prosecution. After the evidentiary hearing was held in January and February of 1998, the trial court denied the petitioner's second motion for a new trial on February 6, 1998.  The petitioner then proceeded with his direct appeal and raised the following issues:

I.      The [State] violated Daniel Wolfe's due process right to a fair trial by bringing him to trial fifteen years after the date of the charged offenses, resulting in significant memory lapses and a loss of records which hindered his ability to effectively cross-examine witnesses.

II.     This Court should grant Mr. Wolfe's motion for new trial and reverse his conviction for first-degree (felony) murder because the verdict is against the great weight of the evidence and because the prosecution failed to produce sufficient evidence of malice to support a verdict of guilt beyond a reasonable doubt, denying defendant due process of law.

        A.      The prosecution failed to produce sufficient evidence of malice to support a conviction for first-degree (felony) murder.

        B.      The trial court reversibly erred by submitting the issue of first-degree premeditated murder to the jury without sufficient evidence concerning Defendant's mental state, subjecting him to the risk of a compromise verdict.

III.    Defendant must be granted a new trial because evidence in support of an alibi was not presented which would have created a reasonable doubt; the evidence is newly discovered as to Defendant Wolfe; in the alternative, Defendant's counsel was ineffective in failing to investigate and present this evidence at trial, as well as evidence that there were several other suspects in this case.

-13-

IV.     The prosecutor denied Defendant a fair trial by introducing evidence which had been suppressed by the court concerning a weapon in possession of the co-defendant which was not connected to the offense.

V.      The prosecutor's comments denigrating defense counsel and defendant himself, and vouching for the credibility of prosecution witnesses denied Defendant a fair trial.

VI.     Defendant was denied a fair trial when a witness was allowed to claim the Fifth Amendment privilege without a determination that the privilege was valid and related to the issues in the case, and where Defendant was not allowed to introduce evidence that this witness had been a suspect.

VII.    The trial court abused its discretion by admitting evidence of little or no probative value which unfairly prejudiced Daniel Wolfe's right to a fair trial.

  A. Defendant was unfairly prejudiced by testimony about his prior incarceration, through which the prosecution portrayed him as a career criminal.

  B. Defendant was unfairly prejudiced by evidence that he was involved in illegal drug usage.

  C. Defendant was unfairly portrayed as a violent man.

  D. These errors were sufficiently serious to deny defendant due process of law and warrant review and reversal by this Court.

VIII.   Defendant was denied a fair trial and an impartial jury where a juror commented that she believed Defendant guilty based on new evidence and the trial court refused to excuse her and denied Defendant's motion to strike the jury panel, and where the spectators were allowed to wear shirts displaying the name of the victim's bar.

  A. The trial court erred in refusing to dismiss the jury panel.

  B. The trial court failed to control the prejudice inherent in the family's wearing of the Silver Rail [Bar] shirts.

IX.     The prosecutor committed reversible error when he asked an alleged accomplice whether he was going to claim the Fifth Amendment if he had not been granted immunity.

-14-

X.     The trial court violated Appellant's due process rights by requiring Appellant to appear in shackles in the presence of the jury; alternatively, counsel was ineffective in failing to request that the leg shackles as well as the handcuffs be removed.

XI.    Defendant was denied a fair trial where the Derbyshire jury came back with a guilty of first-degree murder verdict in the co-defendant's case while Defendant's jury was deliberating and there was massive media coverage of the guilty verdict before Defendant's jury decided Mr. Wolfe's fate.

After remand, the petitioner supplemented his appeal with an additional issue:

I.     Defendant was denied due process of law where crucial evidence was withheld by the prosecutor and was not discovered by his trial attorney due to ineffective assistance of counsel, and the prosecutor failed to adequately investigate the case.

The Michigan Court of Appeals affirmed the petitioner's convictions and the Michigan Supreme Court denied him leave to appeal. *People v. Wolfe,* 193139 (Mich. Ct. App. February 12, 1999); *reh. den.* 193139 (Mich. Ct. App. 1999); *lv. den.* 461 Mich. 958, 607 N.W.2d 728 (2000) (Kelly, J. would grant leave to appeal).

The petitioner filed his petition for a writ of habeas corpus on February 8, 2001.  He raises the following issues:

I. Defendant was denied due process of law where crucial evidence was withheld by the prosecutor and was not discovered by his trial attorney due to ineffective assistance of counsel, and the prosecutor failed to adequately investigate the case.

II. Petitioner was denied his constitutional right to the effective assistance of counsel by his attorney's failure to request the interview with Gary Raab in order to use it for impeachment, and in failing to pursue the co-defendant's alibi defense.

III. The government violated Daniel Wolfe's due process right to a fair trial by bringing him to trial fifteen years after the date of the charged offenses, resulting in significant memory lapses and a loss of records, which hindered his ability to effectively cross-examine witnesses.

IV. The prosecution failed to produce sufficient evidence of malice to support a verdict of guilt beyond a reasonable doubt, denying petitioner due process of law.

-15-

V.  The prosecutor's comments denigrating defense counsel and petitioner himself, and vouching for the credibility of the prosecution witnesses denied petitioner a fair trial.

VI.  Petitioner was denied a fair trial and an impartial jury where a juror commented that she believed him guilty based on a newspaper article, and the trial court refused to excuse her and denied the defendant's motion to strike the jury panel.

The respondent answered the petition, arguing that some of the claims were procedurally defaulted, and all of them lack merit.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), govern this case because the petitioner filed this habeas petition after the AEDPA's effective date.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  That Act "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel.  *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable

-16-

application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir.

1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's

application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21

(quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000); internal quotes omitted). Additionally, this

Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1)

("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody

pursuant to the judgment of a State court, a determination of a factual issue made by a State court

shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating

that "[t]he court gives complete deference to state court findings of historical fact unless they are

clearly erroneous").

  The Supreme Court has explained the proper application of the "contrary to" clause as

follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly
> established precedent if the state court applies a rule that contradicts the governing
> law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established
> precedent if the state court confronts a set of facts that are materially
> indistinguishable from a decision of this Court and nevertheless arrives at a result
> different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

  The Supreme Court has held that a federal court should analyze a claim for habeas corpus

relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision

unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court

defined "unreasonable application" as follows:

-17-

[A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .

[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410-11. *See also Harbison v. Bell*, 408 F.3d 823, 828-29 (6th Cir. 2005); *McAdoo v. Elo*, 365 F.3d 487, 493 (6th Cir. 2004); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc); *Lewis v. Wilkinson*, 307 F.3d 413, 418 (6th Cir. 2002).

## A.

The petitioner first claims that the prosecutor withheld exculpatory evidence that could have been used to impeach Gary Raab. The petitioner refers to the second police interview with Raab, in the presence of Raab's attorney, which was tape recorded by the police and given by Raab in an attempt to gain immunity from prosecution. Although the petitioner was provided Raab's first statement made to the police in December of 1994, in which he denied any knowledge of the murder to the police, as well as a third statement made on September 8, 1995, which mirrored his trial testimony, the petitioner claims that the prosecutor failed to turn over this taped interview with Raab, which did not contain most of the details of the crime to which Raab testified at trial. Furthermore, Detective Edwards did not summarize Raab's taped interview in his police report and referred to Raab only as a confidential informant in his notation of the interview.

The contested interview took place in June of 1995. In his taped statement, Raab vaguely described smoking marijuana and riding around with the petitioner and Derbyshire one summer night. Raab told police that the petitioner and Derbyshire stopped a few times to get out of the car.

-18-

He stated that the petitioner and Derbyshire talked about stealing money, and he thought the target of the crime was "a bar, restaurant or a building."  Tr. of Recorded Interview of 6/21/95 at 7.  Raab never mentioned seeing the robbery and he never mentioned the Silver Rail Bar.  Raab never mentioned that he heard or saw any gunshots, nor did he mention hearing any incriminating statements from the petitioner or Derbyshire.

After the group dropped off Joe Griehs, Raab said, he smoked marijuana and may have fallen asleep.  He described stopping at a wooded area where the petitioner and Derbyshire left the car for a while and then returned.  He described driving to a field where the petitioner and Derbyshire left the car again and Raab got out and saw that the two had taken their shirts and shoes off.  At this point, Raab explained, "everything was going so fast, I was high, I mean I was really high, and paranoid, and when Greg started hollering at me, he turned, I saw a gun in his hand."  *Id*. at 10.  Raab said that he thought he heard Derbyshire say, "[S]hould we kill him?" and the petitioner told Derbyshire to leave Raab alone.  *Id*. at 12.  As they drove away from the field, Derbyshire said to the petitioner, "He will know our secret place," but the petitioner said that Raab was too high to remember.  *Id*. at 11.  Raab said that the petitioner and Derbyshire then finally took him home.

When Raab finished telling this story, Detective Edwards cautioned him that it was important for him to tell them everything.  Raab responded, "Well see I, I, told you everything that I – know."  Tr. of Recorded Interview of 6/21/95 at 14.  Detective Edwards and Raab's attorney told Raab again that he should tell them anything else that he might remember.  Raab responded, "Why I, I, told you everything that I possibly know."  *Id*. at 15.  Raab was asked a few specific questions about the kind of gun he saw and whether he saw a metal box; he said that he thought he could show the detective the places where they stopped in the car.  Then the tape was interrupted for half an hour, ostensibly

so the prosecutor could use the bathroom.  After the tape was turned on again, no one on the tape described what transpired during the break.

The interview resumed with Detective Edwards asking Raab for more details about the time that the petitioner and Derbyshire stopped the car at the field.  Raab again explained that after they stopped at the field, the petitioner and Derbyshire took Raab home.  The detective asked him what time it was when Raab and Griehs left the mall and what happened the next day.  Raab explained that when he went to the petitioner's apartment the next day, the curtains were closed and the petitioner or Derbyshire did not want him to open them.  He said that he saw some change on a "thing built along the wall."  *Id.* at 20.  The entire interview lasted approximately an hour and twenty minutes.

The petitioner claims that in addition to the taped statement, the prosecution also withheld evidence that at the time of the commission of the murder in September of 1980, Raab was an inmate of a resident home program supervised by the Michigan Department of Corrections.  Inmates in the program resided at one of two hotels in the Jackson area or in a residence.  They had a curfew of 10:00 or 11:00 p.m. and an inmate who violated this curfew could lose privileges.  Inmates were also subject to periodic drug testing and were prohibited from associating with criminals.  Violations of any of these rules would result in disciplinary action, including transfer to higher-level facilities or the delay of parole.  The petitioner claims that this information could have been used to impeach Gary Raab by demonstrating that he was breaking the rules of his program.

The Michigan Court of Appeals rejected the petitioner's argument that he should be granted a new trial based on newly discovered evidence.  The court stated:

> There is no merit to defendant's claim that he was denied a fair trial because the prosecutor failed to disclose a taped statement made by Gary Raab on June 21, 1995,

> which defendant asserts could have been used by the defense to impeach Raab's
> credibility at trial. In reviewing this claim, we consider whether (1) the suppression
> was deliberate, (2) the evidence was requested, and (3) the defense could have
> significantly used the evidence. *People v. Miller (After Remand)*, 211 Mich. App.
> 30, 47; 535 N.W.2d 518 (1995). There was no evidence that the police or prosecutor
> deliberately failed or refused to disclose the statement in question. The existence of
> the taped statement was disclosed in a police report provided to defense counsel prior
> to trial and was disclosed at the preliminary examination. Further, it is undisputed
> that the defense did not request the taped statement until after trial, and that when the
> request was made, the tape was provided to the defense. Finally, defendant has not
> demonstrated that the defense could have significantly used the evidence to render
> a "reasonable probability" that the result would have been different had the evidence
> been given to the defense. *See Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131
> L. Ed. 2d 490, 505-08 (1995); [*People v.*] *Stanaway, supra* at 666; [*People v.*]
> *Barbara, supra* at 362-63. The evidence was not "newly discovered." *Id.*

*People v. Wolfe*, No. 193139, 1999 WL 33454812, at *6 (Mich. Ct. App. Feb. 12, 1999). The

Michigan Court of Appeals further found that the petitioner's attorney was aware prior to trial of

Gary Raab's status as an inmate at the residential home program. The court explained that Raab's

status in such a program did not foreclose the possibility that he was present at the crime, and noted

that Raab's credibility was impeached "extensively" during the trial. Finally, the state court of

appeals held that this impeachment evidence was insufficient to warrant a new trial. *People v.*

*Wolfe,* 1999 WL 33454812, at *6.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that suppression by

the State of evidence favorable to the accused violates the Due Process Clause where the evidence

is material to either guilt or punishment, irrespective of the good or bad faith of the prosecution. The

*Brady* rule is violated when (1) the evidence at issue is favorable to the accused, either because it

is exculpatory or because it may impeach important inculpatory evidence; (2) the evidence was

suppressed by the State, either willfully or inadvertently; and (3) prejudice ensued. *Strickler v.*

*Greene*, 527 U.S. 263, 281-82 (1999). To establish a *Brady* violation, an accused person must show

-21-

that the prosecution suppressed evidence, that the evidence was favorable to the accused, and that the evidence was material. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). A *Brady* violation is grounds for setting aside a conviction or a sentence in a habeas proceeding only if the failure to disclose the evidence "undermines confidence in the verdict[] because there is a reasonable probability that there would have been a different result had the evidence been disclosed." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).

The petitioner's *Brady* claim fails because the petitioner received adequate notice of the existence of the tape. As the state court of appeals noted in its decision, the existence of this taped interview with Raab was mentioned in a police report and at the preliminary examination. Although the police report identified Raab only as a confidential informant, Detective Edwards testified at the preliminary examination that this taped interview had been with Raab. Prelim. Exam. Tr. at 401. The State does not violate the *Brady* rule when a defendant is aware of essential facts that would allow him to take advantage of exculpatory evidence, *Coleman v. Mitchell*, 268 F.3d 417, 438 (6th Cir. 2001); *Coe*, 161 F.3d at 344, whether the evidence would allow impeachment or constitute exculpatory evidence. *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000). Because the petitioner was made aware of the existence of the taped interview with Gary Raab at the preliminary examination, there was no suppression by the prosecution of exculpatory information. *See United States v. Hernandez-Muniz*, 170 F.3d 1007, 1011 (10th Cir. 1999) (no *Brady* violation where the government provided the allegedly exculpatory information at the preliminary hearing).

In addition, the state court found that no prejudice resulted from the failure to turn over the tape to defense counsel prior to trial. All the participants in the taping session save Raab testified at a post-trial hearing that the taped recording was an incomplete record of Raab's statements on that

occasion, and Raab had gone into further detail about the crime during a break when the tape recorder was turned off.  For instance, Fabian testified that during the break, Raab said that he had seen the flash of a gun and had seen both defendants with a third person.  Dungan testified that Raab said that he had seen the defendants with a third man.  The trial court concluded that the additional information echoed Raab's assertions at the third interview and at trial, so the impeachment value of the session was diminished substantially.  The Court finds that this conclusion is reasonable in the context of the entire record.

The petitioner's second *Brady* claim relating to the undisclosed fact of Raab's inmate status also fails because he has failed to show that the prosecution withheld any information from him. At the evidentiary hearing, the prosecutor said that a copy of Raab's criminal record, but not his prison record, was provided to the defense.  The prosecutor also noted that the fact that Raab had been on extended furlough during that time was included in the police report.  The petitioner has not shown that the prosecutor withheld any information from him concerning Raab's inmate status. Moreover, it is doubtful that Raab's residential home status would have impeached his credibility. According to Todd Boyd, Raab's former parole officer, the program was loosely structured at the time.  Because only one person checked up on persons in the program, violations could have occurred without detection by the Department of Corrections.  Thus, the petitioner has failed to demonstrate how Raab's participation in the program would have impeached his trial testimony.

The Court finds that the state court faithfully applied federal law as established by the Supreme Court to a sensible determination of the facts.  Habeas relief is not warranted on this claim.

-23-

B.

The petitioner argues that his trial counsel was ineffective when he failed to request the taped interview with Raab for impeachment purposes and when he failed to develop the co-defendant's alibi defense.  The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel.  *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.  An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness."  *Id*. at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*. at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id*. at 689.

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*. at 687.  The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*. at 694.  Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."  *Strickland*, 466 U.S. at 687.

1.

The petitioner first contends that his attorney was ineffective for failing to obtain a copy of Gary Raab's June 1995 taped statement to the police in which he omitted certain details of the crime

-24-

to which he later testified at trial.  The petitioner also claims that trial counsel was ineffective for failing to investigate whether Raab was under sentence at the time of the crime in order to impeach him with his residential home program status.

After the post-conviction evidentiary hearing conducted pursuant to *People v. Ginther*, 390 Mich. 436, 443-44 (1973) (holding that "[a] defendant who wishes to advance claims that depend on matters not of record can properly be required to seek at the trial court level an evidentiary hearing for the purpose of establishing his claims with evidence as a precondition to invoking the processes of the appellate courts"), the trial court concluded that trial counsel was not ineffective:

> The only issue that gives this Court a moment to pause is the failure of trial counsel to obtain the taped statement of June 21, 1995, by Gary Raab.  The Court is satisfied after careful review that the aforementioned statement contained such statements or alleged statements made during the recess as to satisfy the Court that there is not a reasonable probability that the results of the proceeding would have been different.

Trial Court Opinion & Order, Feb. 6, 1998.  The "recess" presumably refers to the gap in the record of the interview during which the tape recorder was turned off, described earlier.

The state court of appeals did not address this issue in its opinion.  Therefore, this Court considers the trial court's opinion as the last reasoned decision of the state court on this issue and applies the AEDPA's standard of review to that decision.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (holding that if the last state court judgment contains no reasoning, but simply affirms the conviction in a standard order, the federal habeas court must look to the last reasoned state court judgment rejecting the federal claim and apply a presumption that later unexplained orders upholding the judgment or rejecting the same claim rested upon the same ground).

The petitioner's trial counsel, Sean Carroll, testified at the evidentiary hearing that he did not recall requesting the taped interview with Gary Raab and could not recall why he did not request

-25-

it, but that he might have believed that it was destroyed.  Carroll testified that he would have used Raab's taped statement to impeach Raab if he had the statement at the time.  Carroll's testimony suggests that his failure to request the taped statement was not a matter of trial strategy, but rather a mistake or oversight.  When Carroll learned that a taped statement existed, he should have requested it or investigated further to determine if Raab had made inconsistent statements.  *See Blackburn v. Foltz*, 828 F.2d 1177, 1184 (6th Cir. 1987) (finding as ineffective assistance when counsel failed to obtain the transcript of an eyewitness's prior testimony for use in impeaching the eyewitness).  It is likely that counsel's performance fell below an objective standard of reasonableness in this instance.

The trial court concluded that the inconsistent statements in the taped interview would not have affected the outcome of the trial.  The trial court weighed the fact that the defense already had an inconsistent statement from Raab: his first statement to police that he knew nothing about the crime.  Taking into account the inconsistent statements in the tape and the consistent statements Raab allegedly made while the tape recorder was turned off, the trial court found that the petitioner was not prejudiced.

However, Raab's testimony was crucial to the prosecution because he was the only alleged eyewitness to the crime.  Although the defense impeached Raab with his first statement to police that he knew nothing about the crime, Raab testified that he initially refused to tell the police what he knew because he was scared.  The taped interview was his second statement to police, made in the presence of his attorney, and in it he mentioned getting high and riding around in a car with the defendants while they stopped at various unknown places and seeing Derbyshire with a gun, but he failed to mention hearing gunshots, seeing a flash, seeing the defendants with a third person, or

-26-

going to the petitioner's apartment and arguing about a shooting.  In his third statement, which was written and earned him immunity from prosecution, Raab recounts most of the details that he recounted in his trial testimony.  The fact that Raab could not recall these details at a time when he was trying to cooperate with police and gain immunity from prosecution would have been an important impeaching fact.

Nevertheless, there is no reasonable probability that, absent counsel's deficient performance, the result of the trial would have been different.  The petitioner's trial counsel impeached Raab with the fact that he was testifying against the petitioner in exchange for a grant of immunity from prosecution for this murder and the fact that the petitioner had been involved in legal action against Raab.   In addition, other witnesses testified that the petitioner participated in casing the bar, engaged in an argument with Derbyshire about a killing, and talked about the crime afterwards. Moreover, the petitioner is unable to establish that he was prejudiced by counsel's failure to impeach Raab with his inmate status.  Because Raab could have violated the conditions of his residential program without getting caught, the fact that he was violating those conditions by his actions on the night of the crime was not sufficiently material to undermine confidence in the outcome of the case.

### 2.

The petitioner next alleges that his attorney was ineffective for failing to investigate or present an alibi defense to show that his co-defendant, Gregory Derbyshire, was working the afternoon shift at his place of employment on September 3, 1980, during the time that Gary Raab claims that the petitioner and Derbyshire were planning the robbery of the Silver Rail Bar.

Derbyshire's attorney testified at the *Ginther* hearing that he did not present this particular alibi defense on behalf of his client because the payroll records showed that Derbyshire had worked

only 32 hours that week, while he had worked 36 hours the previous week.  The petitioner concedes that it was not possible to tell from the payroll records which days of the week that Derbyshire worked.  Derbyshire's attorney decided not to present the alibi defense because some of the other employees worked 40 hours that week.  Derbyshire's attorney said he could find no records to corroborate an alibi defense for Derbyshire.  The petitioner's trial counsel testified that he relied on Derbyshire's counsel to investigate Derbyshire's alibi defense.

The petitioner claims that his own attorney was ineffective for failing to present evidence in support of this alibi defense.  In support of this claim, the petitioner notes that Labor Day in the year of the crime, 1980, fell on Monday, September 1.  The previous week, Derbyshire worked only 36 hours.  The petitioner contends that the most "likely scenario" is that Derbyshire left work early on the Friday prior to Labor Day and had the following Monday off for Labor Day.

The state court of appeals considered this argument and held that, even if counsel had investigated and presented this defense, there was no reasonable probability that the result of the proceedings would have been different.  The court noted that petitioner would be able to argue only the mere possibility that Derbyshire had not worked on Labor Day.

The petitioner has presented no evidence that would have enabled his attorney or Derbyshire's attorney to corroborate an alibi defense on behalf of Derbyshire.  The employment records that were obtained by Derbyshire's attorney only show that Derbyshire worked during the week of the crime.  Because these records could not have provided an alibi for the particular night of the crime, counsel was not ineffective for failing to present an alibi defense. *See Matthews v. Rakiey,* 54 F.3d 908, 918-19 (1st Cir. 1995) (counsel's failure to call defendant's employer as an alibi witness did not prejudice defendant and was therefore not ineffective assistance, although the

employer's testimony would have corroborated defendant's testimony that he worked at an auto body shop and that the shop generally opened early in the morning, when the crime allegedly occurred, the employer would not have been able to provide an alibi for defendant on the particular day of the crime).

Secondly, even if this alibi defense had been presented, it would not have accounted for the whereabouts of Derbyshire or the petitioner at the time of the shooting in the early morning hours of September 4, 1980. The petitioner therefore was not prejudiced by counsel's failure to present an alibi defense that showed that Derbyshire had worked the afternoon shift on September 3, 1980; that evidence would have covered only part of the period of the crimes charged and would not have directly refuted testimony of the petitioner's involvement in the victim's murder in the early morning hours of September 4, 1980. *Cf. United States v. Andrews*, 953 F.2d 1312, 1327 (11th Cir. 1992); *see also Trigones v. Hall,* 115 F. Supp. 2d 158, 169 (D. Mass. 2000) (counsel not ineffective for failing to interview potential alibi witnesses who would have only provided a "floating alibi" that did not cover the entire period during which the murder could have been committed).

3.

The petitioner next claims that his attorney was ineffective for failing to present evidence that the police had been told that there were other suspects in this case. The petitioner notes that there was evidence that a confidential informant had told the police that Roland Traham had murdered the victim. Another person, Wayne Laverne Walker, told the police that Lee Sanders murdered the victim.

The petitioner's claim fails for several reasons. The evidence at the *Ginther* hearing established that Wayne Walker was a transient diagnosed with paranoid schizophrenia. Not only

-29-

could the police not locate Walker, neither could his own brother.  In the absence of Walker, any testimony by the police that Walker had told them that Lee Sanders had murdered the victim would have been inadmissible hearsay.  *See* Mich. R. Evid. 801.  The same holds true of any testimony that an unnamed confidential informant, whom the police could no longer identify, had told them that Roland Traham, who is now deceased, killed the victim.  In order to establish an ineffective assistance of counsel claim, the petitioner must show that the witnesses would have testified if called, and that their testimony would have provided a viable defense.  The petitioner's claim fails because he has presented no evidence that these witnesses could have been located, or that they would have testified if called.  *See Leisure v. Bowersox,* 990 F. Supp. 769, 822 (E.D. Mo. 1998).

More importantly, the petitioner's attorney did present evidence that other suspects might have been involved in the murder.  Defense witness Carol France testified that in the early morning of September 4, 1980, she heard what sounded like a backfire.  Later, she observed one of her tenants, Christopher Fry, drive by in a pick up truck.  France observed Fry drop something metal in her dumpster, which made a loud bang.  A second defense witness, Eugene Hobbins, testified that at around 3 a.m. in early September, he saw his neighbor John Wheeler run fast and dive into Wheeler's basement window.  Hobbins testified that during this time frame, Wheeler attempted to sell him two .22 caliber rifles.  John Wheeler also testified; he admitted committing several burglaries, including one at the Silver Rail Bar in 1981 or 1982, but denied running home on September 4, 1980.  Finally, the petitioner's attorney tried to call Randy Coppernoll to question his involvement in the crime, but he invoked his Fifth Amendment privilege and refused to answer questions.  Counsel, therefore, presented or attempted to present evidence that pointed to the

-30-

possibility that third parties may have been involved in this homicide. Counsel's performance did not fall below an objective standard of reasonableness.

4.

Lastly, the petitioner claims that the cumulative nature of the errors deprived him of the effective assistance of counsel. Because the individual claims of ineffectiveness alleged by the petitioner are without merit, the petitioner cannot show that the cumulative errors of his counsel amounted to ineffective assistance of counsel. *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

C.

The petitioner next argues that his due process rights were violated because there was a fifteen-year delay between the time of the murder on September 4, 1980 and his arrest on August 26, 1995.

In rejecting this claim, the Michigan Court of Appeals found that the petitioner had failed to establish that the prosecutor intentionally delayed this case to gain a tactical advantage. That court further found the petitioner had failed to establish that he had suffered substantial prejudice as a result of the delay. *People v. Wolfe,* Slip. Op. at * 1-2.

When determining whether pre-indictment delay violates the Due Process Clause, a habeas court must consider the reasons for the delay as well as prejudice to the accused. *United States v. Lovasco*, 431 U.S. 783, 790 (1977). Dismissal for pre-indictment delay is appropriate only upon proof that (1) the delay substantially prejudiced the defendant's right to a fair trial and (2) the delay was intentionally brought about by the government to gain a tactical advantage. *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992). The prosecution of a defendant following a delay that is

-31-

investigative in nature does not deprive the defendant of due process even if some prejudice to the defendant results. *Lovasco*, 431 U.S. at 796.

The state court of appeals rejected the petitioner's claim because the petitioner did not establish that the prosecutor intentionally delayed the arrest to gain a tactical advantage. That finding is reasonable. The petitioner claims that the delay was an intentional tactic because it "allowed the suggestiveness of Det. Edwards' questioning to influence the answers given by key witnesses, who were contacted again and again, until they changed their stories to fit the picture that the prosecution wished to hear." Petitioner's Brief in Support of the Petition for Writ of Habeas Corpus, at 58. The petitioner does not allege, however, that the police or prosecution delayed the arrest of the petitioner or his co-defendant for the express purpose of allowing evidence or witnesses to disappear or for the memories of defense witnesses to become impaired.

In the present case, the prosecutor had declined to proceed until 1995 when he had evidence sufficient to present to a jury after some key witnesses come forward. The Supreme Court in *Lovasco* recognized "that the interests of the suspect and society are better served if, absent bad faith or extreme prejudice to the defendant, the prosecutor is allowed sufficient time to weigh and sift evidence to ensure an indictment is well founded." *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($ 8,850) in U.S. Currency*, 461 U.S. 555, 563 (1983).

The petitioner claims that the fifteen-year delay caused witnesses' memories to fade. The petitioner also claims that the delay caused certain documents or records to be destroyed. Because of the fifteen-year delay, neither the petitioner nor Derbyshire allegedly could prove that Derbyshire was working the afternoon shift of September 3, 1980 in support of a partial alibi defense, because Derbyshire's employment records had been purged. The petitioner also claims that because of the

-32-

passage of time, the petitioner's landlord, Ronald McClumpha, could not state with certainty whether the petitioner was living with Donna Kilgore on 17th Street on September 4, 1980 because he did not retain some of his records. The petitioner claims that demonstrating that the petitioner and Kilgore did not live together on 17th Street on the day in question would have been "nearly conclusive proof" that Kilgore's testimony had been fabricated.

However, a habeas petitioner must make more than a vague assertion that memories have diminished, witnesses have been lost, and documents have been misplaced to establish actual prejudice from a pre-indictment delay. *United States v. Beszborn,* 21 F.3d 62, 67 (5th Cir. 1994). The petitioner has failed to demonstrate, in more than a vague or generalized fashion, how he has been prejudiced by the passage of time between the crime and his arrest. The petitioner's claim concerning his co-defendant's purported alibi is simply too speculative to warrant relief.

The petitioner's related claim involving the loss of documents by his former landlord is equally speculative. The petitioner claims that these records could have demonstrated that the petitioner or Kilgore were no longer living at the 17th Street address on September 4, 1980 and could have refuted Raab's or Kilgore's testimony. However, the petitioner's ex-landlord, Ronald McClumpha, had retained a copy of the lease signed by the petitioner and Kilgore on July 1, 1980, and a copy of a lease signed by the next tenants dated September 27, 1980, as well as records indicating that the petitioner's rent was paid only for July and August. Although the petitioner notes that collection notices and notices of eviction are regularly sent to tenants who do not pay their rent, the petitioner cannot say for certain that records would have existed that would have shown that petitioner had moved out of the apartment by the time of the crime.

Finally, although it is true that the passage of time likely impaired the memories of various witnesses, the petitioner was able to cross-examine these witnesses and impeach their testimony. Even if the petitioner was prejudiced by the lapse of time, the decision to prosecute him did not deprive him of due process because the delay was an investigative delay. *Lovasco*, 431 U.S. at 796. The state court's decision did not unreasonably apply Supreme Court precedent.

D.

The petitioner next challenges the sufficiency of the evidence. "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364 (1970). The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).

> [T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.* at 318-19 (internal citation and footnote omitted). This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. Normally, pursuant to 28 U.S.C. § 2254(d)(1), this Court must determine whether the state court's application of the *Jackson* standard was contrary to or an unreasonable application of Supreme Court precedent.

On habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. *Marshall v. Lonberger*, 459 U.S.

-34-

422, 434 (1983).  It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony.  *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992).  A habeas court must defer to the fact finder for its assessment of the credibility of witnesses.  *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003).  The Court does not apply the reasonable doubt standard when determining the sufficiency of evidence on habeas review.  *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir. 1995).

The petitioner first argues that the evidence was insufficient to establish the element of malice, which is necessary to prove felony murder.  In Michigan, the elements of first-degree felony murder are (1) the killing of a human being; (2) with an intent to kill, to cause great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm is the probable result, (3) while committing, attempting to commit, or assisting in the commission of one of the felonies enumerated in the felony murder statute.  *People v. Carines*, 460 Mich. 750, 759; 597 N.W.2d 130 (1999).  The second element, that is, proof of an intent to kill, an intent to do great bodily harm, or with a wanton and willful disregard of the likelihood that the natural tendency of his behavior is to cause death or great bodily harm, *Grant v. Rivers*, 920 F. Supp. 769, 784 (E.D. Mich. 1996) (citing *People v. Aaron*, 409 Mich. 672, 733; 299 N.W.2d 304 (1980)), is referred to as "malice," and it must be proved as a distinct element.  The facts and circumstances surrounding a killing can give rise to an inference of malice, and a jury may infer malice from evidence that a defendant intentionally set into motion a force likely to cause death or great bodily harm.  *People v. Dykhouse,* 418 Mich. 488, 494; 345 N.W.2d 150 (1984).

In the present case, there was sufficient evidence for a rational trier of fact to conclude that the petitioner acted with malice when he participated in shooting the robbery victim.

Michigan courts have had little difficulty finding malice as an element of murder from evidence that a defendant voluntarily participated in robbing a victim using a firearm, even though that defendant was not the actual shooter. *See, e.g., People v. Hart*, 161 Mich. App. 630, 411 N.W.2d 803 (1987) (finding that the defendant's involvement in a robbery where a gun was involved showed wanton and wilful disregard of the likelihood that his behavior would cause death or serious bodily injury); *People v. Turner,* 213 Mich. App. 558, 572-573, 540 N.W.2d 728, 735 (1995), *overruled in part on other grounds by People v. Mass*, 464 Mich. 615, 628 N.W.2d 540 (2001) (finding evidence of malice where the defendant knew that the co-defendant was armed during the commission of the armed robbery in which the co-defendant killed the victim).

In the present case, the evidence established that the victim was shot and killed during an armed robbery, which the petitioner planned and executed with the co-defendant. When viewed in a light most favorable to the prosecution, the evidence would enable a rational trier of fact to conclude that the petitioner acted with the malice required to sustain a felony murder conviction because he participated in a robbery in which a firearm intentionally was used. Put another way, the evidence at trial was sufficient to establish that the petitioner engaged in a course of conduct that intentionally created a high risk that death or serious injury likely would result.

The petitioner next claims that the evidence was insufficient to convict because there were inconsistencies in the witness's testimony. However, an assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. *Gall v. Parker*, 231 F.3d 265, 286 (6th Cir. 2000). If there is evidence in the record from which a jury *could* find the elements of the crime beyond a reasonable doubt, the evidence is constitutionally sufficient. *Ibid.* It is true that the testimony of various witnesses conflicted on numerous critical facts, and that

-36-

more than one witness's stories changed over time.  Nevertheless, the jury was free to find one witness more credible than the other and this Court will not second-guess the jury's credibility decisions.

The Court notes that some of the important witness testimony conflicted with some of the physical evidence.  For example, Raab testified that the petitioner, Derbyshire, and the victim were standing close together when the gun discharged; Raab testified to hearing one gunshot.  Similarly, Michael Hession testified that the petitioner confessed to him that the gun went off during a struggle.  On the contrary, the autopsy results showed that the victim was shot twice in the back and side of the head behind his ear with a .22 rifle, and no powder burns were observed on the victim, suggesting that he was not shot at close range.  Police witnesses testified that two additional shots had been fired into the victim's vehicle.  Another inconsistency resulted from the testimony of Wade Miller that Tom Walling was present in the vehicle when he and the petitioner and Derbyshire cased the bar in July and August of 1980 just before the murder; it was established through prison records that Walling was in prison from 1979 to 1982.  The jury was charged with the task of sorting through the evidence.  It was not obliged to accept the physical evidence and reject the witness testimony, or *vice versa*.  Certainly, the record would have supported an acquittal, but that is of no moment if the evidence also could convince "*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt," *Jackson*, 443 U.S. at 319, as the Court has concluded here.

Lastly, the petitioner claims that the trial court reversibly erred by submitting the issue of first-degree premeditated murder to the jury without sufficient evidence to establish the elements of premeditation and deliberation.  The petitioner claims that this subjected him to the risk of a

compromise verdict.  The respondent contends that submission of the premeditated murder count to the jury was harmless, because the jury found him guilty only of felony murder.

The Supreme Court has recognized that the improper submission of a greater charge to the jury can violate the Due Process Clause even when the jury convicts of a lesser charge.  *See Price v. Georgia*, 398 U.S. 323 (1970).  Error in that instance is not harmless.  This Court has held that a constitutional violation warranting habeas relief could occur if the jury is allowed to consider a greater charge not supported by sufficient evidence, even when a conviction of a lesser offense results.  *See Williams v. Jones*, 231 F. Supp. 2d 586, 594 (E.D. Mich. 2002) (holding that "if the trial judge's submission of the first-degree murder charge in the petitioner's trial violated the constitution, the error would not have been harmless because the jury may have improperly considered, and compromised from, a charge to which it never should have been exposed.  To hold otherwise would constitute an unreasonable application of *Price*").

However, this is not such a case.  Sufficient evidence existed to convict the petitioner of premeditated first-degree murder.  Testimony at trial indicated that the petitioner had participated in planning a robbery that included jumping off the roof of the bar onto the victim, and the petitioner and Derbyshire were aware that the victim would be armed.  Evidence from the crime scene established that four shots were fired at the victim.  This is evidence from which the jury could have concluded that the petitioner intended to kill the victim and take his money.

### E.

The petitioner next claims that he was deprived of a fair trial by several instances of prosecutorial misconduct.  The respondent contends that, with one exception, the petitioner's prosecutorial misconduct claims are procedurally defaulted because his trial attorney failed to object

at trial, and the Michigan Court of Appeals expressly relied on the failure to object as precluding appellate review absent a showing of manifest injustice. *See People v. Wolfe,* Slip. Op. at * 3-4.

When the state courts clearly and expressly rely on a valid state procedural bar, federal habeas review is also barred unless the petitioner can demonstrate "cause" for the default and actual prejudice as a result of the alleged constitutional violation, or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice". *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). If the petitioner fails to show cause for his procedural default, it is unnecessary for the court to reach the prejudice issue. *Smith v. Murray*, 477 U.S. 527, 533 (1986). However, in an extraordinary case, where a constitutional error has probably resulted in the conviction of one who is actually innocent, a federal court may consider the constitutional claims presented even in the absence of a showing of cause for procedural default. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). However, a claim of actual innocence must be supported with new, reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Actual innocence, which would permit collateral review of a procedurally defaulted claim, means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998).

In this case, the Michigan Court of Appeals held that by failing to object at trial, the petitioner had not preserved most of his prosecutorial misconduct claims. The Michigan Court of Appeals' limited review of the unobjected-to errors for "manifest injustice" does not constitute a waiver of the procedural default by the State of Michigan. *See Paprocki v. Foltz,* 869 F.2d 281, 285 (6th Cir. 1989).

In the present case, the petitioner has offered no new, reliable evidence to establish that he is actually innocent of the crime of felony murder. Nor has the petitioner offered any reason to

establish cause to excuse his procedural default.  The petitioner initially argued in his petition that his trial attorney was ineffective for failing to object to the prosecutorial misconduct, but the respondent moved to dismiss the habeas petition as a mixed petition because this ineffective assistance of counsel claim had not been exhausted in the state courts.  In response, the petitioner agreed to withdraw this portion of his claim from consideration.

For ineffective assistance of counsel to constitute cause to excuse a procedural default, that claim itself must be exhausted in the state courts.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). The petitioner in this case never raised in the state courts the specific claim that counsel had been ineffective for failing to object to these instances of prosecutorial misconduct.  Therefore, the alleged constitutional ineffectiveness of trial counsel cannot constitute cause for the petitioner's procedural default.

Because the petitioner has not demonstrated any cause for his procedural default, this Court need not assess prejudice. *Smith v. Murray*, 477 U.S. at 533.  The petitioner has not presented any new reliable evidence to support a claim of actual innocence.  Therefore, the Court must conclude that nearly all of the petitioner's claims of prosecutorial misconduct are barred by the doctrine of procedural default.  *See* 28 U.S.C. § 2254(b)(1); *Coleman*, 501 U.S. at 750-51.

However, there is one claim of prosecutorial misconduct that was preserved by objection at trial: the prosecutor referred to the petitioner as "Smilin' Jack" in his rebuttal argument.  The Michigan Court of Appeals rejected the petitioner's claim, finding that even if the remark was improper, it was isolated, and after the petitioner's counsel had objected the prosecutor was admonished by the trial court to refrain from such commentary.  *People v. Wolfe,* Slip. Op. at * 4.

-40-

Prosecutorial misconduct will form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. *Donnelly*, 416 U.S. at 643-46; *see also Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir. 1999) (stating that "[p]rosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation"). The determination whether the trial was fundamentally unfair is "made by evaluating the totality of the circumstances surrounding each individual case." *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982). The Court must focus on "the fairness of the trial, not the culpability of the prosecutor." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993)).

The Sixth Circuit has prescribed four factors to consider when analyzing such claims: (1) the likelihood that the statements would prejudice the defendant or mislead the jury; (2) whether the remarks were isolated or part of a pattern; (3) whether the prosecutor's statements "were deliberately or accidentally presented to the jury"; and (4) whether the other evidence against the defendant was substantial. *Gall v. Parker*, 231 F.3d 265, 311 (6th Cir. 2000) (citing *United States v. Carroll*, 26 F.3d 1380, 1385-87 (6th Cir. 1994)).

In the present case, the prosecutor's reference to the petitioner as "Smilin' Jack," although inappropriate, does not warrant habeas relief. The reference was isolated, it did not mislead the jury with respect to any facts in the case, and the trial court admonished the prosecutor not to make such arguments in front of the jury. The state courts' resolution of this issue was not contrary to or an unreasonable application of federal law as established by the Supreme Court.

-41-

F.

Finally, the petitioner claims that he was denied a fair trial because a prospective juror, one Bonnie Joice, commented during voir dire that she believed that the petitioner was guilty of this crime. Ms. Joice based her belief upon evidence about the case that she had read in the newspapers. After questioning by the court, Ms. Joice stated that she would take into consideration only the evidence and testimony presented in the courtroom. The petitioner's attorney moved to have Joice removed for cause; the trial court denied the motion. Later, Ms. Joice was excused by the petitioner's peremptory challenge. However, because Joice's comments were made in front of the jury, the petitioner's counsel moved to strike the jury panel. The trial court denied the motion. The state court of appeals rejected this claim. It noted that the petitioner's counsel had elicited the comments from Joice, her comments had been brief, and the trial court gave a curative instruction to the jurors. The state appellate court also pointed out that the jury panel had been extensively voir dired by both the trial court and counsel, and the jurors who served on the panel declared that they could be fair and impartial and did not have an opinion regarding the petitioner's guilt. *People v. Wolfe,* Slip. Op. at * 5.

The right to a jury guaranteed by the Sixth Amendment contemplates a panel of impartial, "indifferent" jurors. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The petitioner has not demonstrated that the comment of venirewoman Joice infected the rest of the panel. In fact, subsequent questioning suggested otherwise. The mere fact that the juror said that she knew and did not like the petitioner, and was later excused, was no basis to claim that the entire panel was somehow tainted. "If such were the case, every time a juror stated an opinion, favorable or unfavorable, about

-42-

a party, and was later excused, it would be almost impossible to obtain a jury, particularly in smaller communities.  Such is not the law." *Harmon v. Anderson,* 495 F. Supp. 341, 342 (E.D. Mich. 1980).

The petitioner has presented no evidence that any of the remaining jurors were tainted by Joice's comments.  All of the jurors stated that they could be fair and impartial and would base their decision solely on the evidence presented in court.  Joice, in fact, told the court that she could set aside her opinion and render a verdict based solely upon the evidence presented in court.  A prospective juror's exposure to pre-trial publicity does not merit her disqualification, where the juror states unequivocally, as in this case, that she would decide the case on the facts brought out at trial. *McQueen v. Scroggy*, 99 F.3d 1302, 1319 (6th Cir. 1996).  The petitioner was able to use a peremptory challenge to remove Joice.  The state courts' conclusion that the remaining jury panel was untainted, and therefore the petitioner received a fair trial, is not contrary to or an unreasonable application of Supreme Court precedent.

IV.

The Court finds that one set of claims cannot be reviewed on the merits because of the rule of procedural default, and the balance of the claims do not establish a right to relief under 28 U.S.C. § 2254(d)(1) or (2).  Therefore, the petitioner has not shown that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [dkt # 3] is **DENIED.**

> s/David M. Lawson
> DAVID M. LAWSON
> United States District Judge

Dated: January 31, 2006

-43-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 31, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS